**[J-8A-B-2023]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, JJ.**

| | | |
|---|---|---|
| SANDRA DINARDO A/K/A SANDRA AFFATATO, AS POWER OF ATTORNEY ON BEHALF OF COSMO DINARDO, | : | No. 22 EAP 2022 |
| | : | |
| | : | Appeal from the Judgment of |
| | : | Superior Court entered on January |
| Appellant | : | 26, 2022, at No. 1905 EDA 2020 |
| | : | affirming in part and reversing in |
| | : | part the Order entered on July 20, |
| v. | : | 2020, in the Court of Common |
| | : | Pleas, Philadelphia County, Civil |
| | : | Division, at No. 460 July Term 2019. |
| CHRISTIAN KOHLER, M.D., HOSPITAL OF | : | |
| THE UNIVERSITY OF PENNSYLVANIA, | : | ARGUED: March 7, 2023 |
| UNIVERSITY OF PENNSYLVANIA | : | |
| HEALTH SYSTEM AND TRUSTEES OF | : | |
| THE UNIVERSITY OF PENNSYLVANIA, | : | |
| | : | |
| Appellees | : | |

| | | |
|---|---|---|
| SANDRA DINARDO A/K/A SANDRA AFFATATO, AS POWER OF ATTORNEY ON BEHALF OF COSMO DINARDO, | : | No. 23 EAP 2022 |
| | : | |
| | : | Appeal from the Judgment of |
| | : | Superior Court entered on January |
| Appellant | : | 26, 2022, at No. 1906 EDA 2020 |
| | : | affirming and reversing the Order |
| | : | entered on July 20, 2020, in the |
| v. | : | Court of Common Pleas, |
| | : | Philadelphia County, Civil Division, |
| | : | at No. 460 July Term 2019. |
| CHRISTIAN KOHLER, M.D., HOSPITAL OF | : | |
| THE UNIVERSITY OF PENNSYLVANIA, | : | ARGUED: March 7, 2023 |
| UNIVERSITY OF PENNSYLVANIA | : | |
| HEALTH SYSTEM AND TRUSTEES OF | : | |
| THE UNIVERSITY OF PENNSYLVANIA, | : | |
| | : | |
| Appellees | : | |

**OPINION**

**CHIEF JUSTICE TODD**                                         **DECIDED: NOVEMBER 22, 2023**

Cosmo DiNardo ("DiNardo"), who suffers from various mental infirmities, confessed to killing four individuals, and pleaded guilty to four counts of first-degree murder. He subsequently filed a complaint against his treating psychiatrist and health care providers, claiming that his criminal conduct was the result of his psychiatrist's grossly negligent treatment, and seeking compensatory damages, indemnification for judgments levied against him by his victims' families, and counsel fees. In this appeal by allowance, we consider whether the "no felony conviction recovery" rule — which prohibits an individual from benefitting or profiting, via the civil laws, from his own criminal conduct — precludes DiNardo's cause of action. As we find that the rule bars the medical malpractice claims at issue in this appeal, we affirm the order of the Superior Court.

DiNardo suffers from bipolar disorder, schizophrenia, and schizoaffective disorder, and, as a result, he exhibits psychosis, grandiose speech, suicidal ideation, as well as homicidal ideation and violent behavior.[1] In December 2016, DiNardo was taken by police to Jefferson Torresdale Hospital, in northeast Philadelphia, after a violent incident during which he attacked his father with a brick and chased him with a pellet gun. He also threatened that he would break into his aunt's home and kill his aunt's parents and young children in an attempt to obtain firearms that he believed she possessed. Appellee Christian Kohler, M.D., assumed responsibility for DiNardo's care and recommended that he be involuntarily committed. After DiNardo began threatening hospital staff and threatening to kill members of his own family, the hospital indicated that it was not equipped to handle him. As a result, DiNardo was admitted to the inpatient rehabilitation unit at Brooke Glen Behavior Hospital, where he was deemed to be suicidal and homicidal, and to pose a risk to those around him.

---

[1] The following facts are alleged in the complaint, described below.

One week after DiNardo was released from the hospital, Dr. Kohler examined him and concluded, despite his homicidal conduct at Brooke Glen, that DiNardo was not a risk to himself or others. Nevertheless, in February 2017, DiNardo was involved in a fight at Temple University. Despite having knowledge of this incident, Dr. Kohler found that DiNardo was in "remission," and reduced the dosage of DiNardo's antipsychotic medication and lithium.

Tragically, five months later, between July 5 and July 7, 2017, DiNardo murdered four men. On July 5, 2017, DiNardo shot and killed Jimi Patrick. DiNardo saw Dr. Kohler the day after the killing. Albeit unaware of the murder, Dr. Kohler continued to believe that DiNardo did not pose a risk to himself or others, and advised him to cease taking all medications. The next day, DiNardo murdered Tom Meo, Dean Finocchiaro, and Mark Sturgis. He was subsequently arrested and charged with first-degree murder.

In May 2018, DiNardo confessed to the four killings and ultimately pleaded guilty to four counts of first-degree murder. Thereafter, families of the victims filed wrongful death actions against DiNardo.

While these civil actions were pending, DiNardo's mother, Appellant Sandra DiNardo (hereinafter, "Appellant"), acting through a power of attorney, filed a complaint on behalf of her son against Dr. Kohler; the Hospital of the University of Pennsylvania (where Dr. Kohler practiced); the University of Pennsylvania Health System (the hospital's parent health system); and the Trustees of the University of Pennsylvania (collectively, "Appellees"). Appellant acknowledged that DiNardo pleaded guilty to intentionally committing the four murders, and that he is under a life sentence. Appellant claimed, however, that her son committed the murders due to Appellees' grossly negligent psychiatric care from December 2016 onward. In support thereof, Appellant alleged that Dr. Kohler, *inter alia*, never obtained records regarding DiNardo's admission at Brooke

Glen; never communicated with the staff there; ignored the warning signs presented by the Temple University incident; and erroneously believed that DiNardo did not pose a threat to himself or others in the days before his killing spree. In further support of her allegations, Appellant retained the services of a forensic psychiatrist who, after reviewing the records of DiNardo's psychiatric treatment, opined that, but for Dr. Kohler's "grossly negligent failure to adequately assess [DiNardo's] risk for violence, it is highly unlikely that [he] would have become involved in the [relevant] offenses." Appellant's Brief at 14.

As discussed more fully below, the first four counts of the complaint, under the caption "Theories of Liability," identically allege gross negligence against each Appellee. *See*, *e.g.*, Amended Complaint at ¶¶ 140-46; 156-62; 171-77; 187-93. Additionally, the complaint sets forth a cause of action for "Gross Negligence - Emotional and Physical Pain" against all Appellees. Amended Complaint at 34. In doing so, Appellant's complaint alleges that DiNardo, through Appellant, seeks recovery for emotional distress and pain because he murdered four individuals; his family's business suffered harm because of the murders he committed; his family has and will incur litigation and other costs because of the murders he committed; and he will be imprisoned for the rest of his life. *See* Amended Complaint at ¶ 202. An additional cause of action for indemnification against all Appellees sought recovery for counsel fees and litigation costs associated with defense of the civil actions and the judgments levied against him. *See* Amended Complaint at ¶¶ 214-15. Finally, the complaint alleged a cause of action against Appellees, Trustees of the University of Pennsylvania, alleging that the Trustees were liable for "the damages described in this complaint," Amended Complaint at ¶ 226 — that is, compensatory damages, indemnification, and counsel fees.

Appellees filed preliminary objections in the nature of a demurrer, which the trial court sustained in part and denied in part. Specifically, Appellees argued that liability was

unavailable under Pennsylvania's no felony conviction recovery rule, which provides that an individual may not benefit or profit, via the civil laws, from his own wrongful conduct. In addition, Appellees added, DiNardo pleaded guilty to, *and was convicted of*, four counts of first-degree murder related to the killings, facts absent from the complaint. *See* Appellees' Preliminary Objections, Introductory Statement at ¶¶ 4, 8-9 & n.1.[2]

The trial court sustained Appellees' preliminary objections with respect to Appellant's demand for indemnification and counsel fees, relying upon this Court's decision in *Vattimo v. Bucks County Hospital*, 465 A.2d 1231, 1236 (Pa. 1983) (plurality) (finding that the right to indemnification resides in the party who "without active fault on his own part, has been compelled, by reason of some legal obligation, to pay damages occasioned by the initial negligence of another, and for which he himself is only secondarily liable;" even a murderer who was found not guilty by reason of insanity, but who played an active role in the events that resulted in injury, could not recover legal damages). The court explained that indemnification and counsel fees were not available to Appellant because DiNardo pleaded guilty to murder[3] and intentionally committed the four homicides, thus, playing an active part in the events resulting in the injuries in the

---

[2] Attached as an exhibit to the preliminary objections was the transcript from DiNardo's guilty plea and sentencing hearing ("Transcript"), which caused Appellant to file preliminary objections to Appellees' preliminary objections. Therein, Appellant requested that the trial court strike the Transcript because it was not attached to the amended complaint and the court could only consider matters arising out of the complaint. Appellant's Preliminary Objections to [Appellees'] Preliminary Objections at ¶¶ 9, 11. Appellant also asked the court to strike paragraphs 3, 4, 9-12 and 17 of Appellees' preliminary objections. Appellant did not, however, ask the court to strike the assertions in Appellees' preliminary objections — such as the Introductory Statement and paragraphs 15, 33 and 34 — which stated that DiNardo had been convicted of first-degree murder. Ultimately, the trial court struck the Transcript as well as paragraphs 11 and 12 of Appellees' preliminary objections. The parties did not challenge these rulings.

[3] The trial court took judicial notice of the fact that DiNardo was convicted of four counts of first-degree murder. Trial Court Opinion, 12/28/20, at 2 n.2.

civil cases. Indeed, the court reasoned that, if, like in *Vattimo*, a person found not guilty by reason of insanity has no right to seek indemnification related to conduct that formed the basis of the criminal proceedings, "then Mr. DiNardo – who pleaded guilty and was convicted of murder – is certainly not entitled to recover attorneys' fees or indemnification for other damages related to civil or criminal legal process." Trial Court Opinion, 12/28/20, at 6.

Nevertheless, although concluding the indemnification and counsel fees were "directly caused by the legal consequences of [DiNardo's] acts," the trial court determined that the compensatory damages that Appellant and DiNardo suffered were not. *Id.* at 10-11 (offering that DiNardo "alleges injuries which are not directly attributable to his criminal convictions, but instead may have been caused directly (or substantially) by [Appellees'] negligence, such as 'severe emotional distress, mental anguish, humiliation, and loss of life's pleasures'" (citation omitted)). Thus, the trial court overruled Appellees' preliminary objections in this regard. While the trial court subsequently denied Appellees' motion for partial reconsideration, it certified the matter for immediate appellate review.[4]

In a published opinion authored by Judge Victor Stabile, the Superior Court reversed in part and dismissed Appellant's complaint in its entirety. *DiNardo v. Kohler*, 270 A.3d 1201 (Pa. Super. 2022). As to compensatory damages, and addressing Appellees' no felony conviction recovery defense, the court determined that Appellant's complaint "expressly links [DiNardo's] compensatory damages to murders for which he has been convicted and sentenced." *Id.* at 1207. Specifically, the Superior Court found that Appellant's amended complaint alleged that DiNardo sought recovery for emotional distress and pain because: "(1) he murdered four men; (2) his family's business suffered harm because of the murders he committed; (3) his family has and will incur litigation and

---

[4] *See* Pa.R.A.P. 312.

other costs because of the murders he committed; and (4) he will be imprisoned for the rest of his life;" thus, the court explained that these allegations "expressly link[] [DiNardo's] compensatory damages to murders for which he has been convicted and sentenced." *Id.*

Furthermore, the court rejected Appellant's claim that the rule does not apply when a party seeks only "compensation," as opposed to "profit," as "an exercise in semantics," emphasizing that, regardless of whether damages are labeled as compensation or profit, the determining factor is that the damages flowed from the criminal conduct underlying the four murders. *Id.* The Superior Court reasoned that, because the alleged damages "flow[ed] from [DiNardo's] own criminal conduct for which he has been convicted," *id.*, the no felony conviction recovery rule barred recovery, relying upon its decisions in *Holt v. Navarro*, 932 A.2d 915 (Pa. Super. 2007), and *Mineo v. Eureka Sec. Fire & Marine Ins. Co.*, 125 A.2d 612 (Pa. Super. 1956), discussed at greater length, *infra*. In coming to this conclusion, the Superior Court distinguished *Vattimo*, where damages for mental anguish, loss of employment, and public humiliation were available, on the basis that Vattimo was found not guilty by reason of insanity, whereas DiNardo was convicted of four first-degree murders. According to the Superior Court, the no felony conviction recovery rule was simply inapplicable in *Vattimo*. Thus, the court concluded that Appellant's demand for compensatory damages was barred under the no felony conviction recovery rule.

The Superior Court agreed, however, with the trial court's determination that Appellant was also not entitled to recover on her claim for indemnification, albeit for different reasons. Specifically, while the trial court relied on the rationale in *Vattimo* that recovery is barred when an individual plays an active part in causing the injury, the Superior Court again explained that *Vattimo*, which involved an individual who was not convicted of a felony but found to be not guilty by reason of insanity, was inapt. Here, the court reasoned that, because Appellant sought indemnification for losses which flowed

from the criminal acts underlying DiNardo's convictions, no recovery was available as a matter of law. Thus, in the court's view, the no felony conviction recovery rule, rather than *Vattimo*, was the proper basis for rejecting Appellant's claim for indemnification damages. Accordingly, the Superior Court affirmed the portion of the trial court's order sustaining Appellees' demurrers for indemnification and counsel fees, reversed the portion of the trial court's order overruling Appellees' demurrer to Appellant's claims for compensatory damages, and dismissed Appellant's complaint in its entirety due to her failure to state a valid claim.

We granted allocatur with respect to the following issue:

> Does the "no felony conviction recovery" rule preclude the award of any civil damages or relief where, as here, [Appellant] alleges that [DiNardo] would not benefit or profit from his own criminal acts, but rather would be compensated for alleged medical malpractice relating to the crimes for which he pleaded guilty?

*Dinardo on Behalf of Dinardo v. Kohler*, 282 A.3d 1129, 1130 (Pa. 2022) (order). Because this matter arises from an order sustaining preliminary objections in the nature of a demurrer, our standard of review requires us to determine "whether, on the facts averred, the law says with certainty that no recovery is possible." *Bruno v. Erie Insurance Co.*, 106 A.3d 48, 56 (2014) (citation and internal quotation marks omitted). Where a doubt exists as to whether a demurrer should be sustained, this doubt should be resolved in favor of overruling it. *Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 866 A.2d 270, 274 (Pa. 2005). Finally, as the underlying decision involves interpretation and application of the no felony recovery rule, a pure question of law, our standard of review is *de novo* and our scope of review is plenary. *Buffalo Township v. Jones,* 813 A.2d 659, 664 n.4 (Pa. 2002).

Appellant argues that the Superior Court erred in finding that DiNardo could not recover due to the no felony conviction recovery rule. In Appellant's view, the rule is inapplicable, as it bars recovery only when a party attempts to benefit or profit from his or her alleged crime, such as in *Mineo*, *supra*, where the plaintiff sought to recover fire insurance proceeds from a building that the owners intentionally burned. Appellant notes that, here, in contrast to *Mineo*, DiNardo is not seeking to benefit or profit from the murders; rather, he is seeking compensation for losses he suffered as a result of Appellees' gross negligence. According to Appellant, the compensatory damages that DiNardo seeks are not the result of his criminal convictions, but, rather, are due to "the violent psychosis brought on by Dr. Kohler's gross negligence." Appellant's Brief at 19.

Further, while the Superior Court found the distinction between compensation and profit/benefit to be merely "semantics," Appellant disagrees, pointing to *Laskowski v. U.S. Department of Veteran Affairs*, 918 F. Supp. 2d 301 (M.D. Pa. 2013). Therein, a veteran was arrested and convicted for burglarizing a pharmacy and stealing drugs to fuel his addiction and mitigate his PTSD, and he and his wife sued the VA hospital responsible for his treatment, alleging economic and non-economic damages; the court held that the no felony conviction recovery rule was inapplicable, reasoning that "this case is not the sort of case where the plaintiff seeks to benefit from the commission of a crime." *Id*. at 331. Appellant claims that compensatory damages are distinct from profit, as such damages are for harm sustained by the individual, such as bodily harm or emotional distress, and are designed to make the person whole. Appellant asserts that, in contrast to compensatory damages, damages for profit, which DiNardo is not seeking and which she concedes are barred by the no felony conviction recovery rule, are limited to punitive damages. Appellant proffers that the only damages requested in the complaint are general compensatory damages seeking to make DiNardo whole, including, "future

judgments that will be levied against him, severe emotional distress, mental anguish, humiliation, and loss of life's pleasures." Appellant's Brief at 23.

Appellant also contends that DiNardo should be able to recover indemnification and counsel fees. Specifically, Appellant maintains that DiNardo will have significant money judgments levied against him due to Appellees' gross negligence and recklessness. According to Appellant, indemnification damages will only restore DiNardo "back to zero by having the true tortfeasors, [Appellees], pay for the damages they caused." *Id.* at 24. Appellant argues that, even if DiNardo's damages flow from his convictions, Appellees must not be permitted to escape liability for their grossly negligent and reckless management of DiNardo's psychological conduction.

While the trial court relied upon *Vattimo* in rejecting Appellant's claim in this regard, she notes that the *Vattimo* plurality found that indemnification was not available in that case because the plaintiff therein played an *active* part in the events which resulted in his injury. Appellant claims that, here, it cannot be said that DiNardo played an active role in the murders, as he "would not have fallen into a violent and homicidal psychosis" if it were not for Dr. Kohler's negligent and reckless treatment of DiNardo's psychological condition. Appellant's Brief at 27-28. In this regard, Appellant goes so far as to assert that *Dr. Kohler* is the "active participant" in the murders and that DiNardo "is not the true party at fault" but is "paying for it with no recourse to recoup his losses." *Id.* at 28.

In any event, Appellant urges that, even if we find that DiNardo was an active participant, we should embrace the standard set forth in Justice Rolf Larson's dissent in *Vattimo*, which would permit a plaintiff to seek indemnification and counsel fees under the circumstances of this case, where Appellees had a duty to protect DiNardo from causing significant harm to himself and others. Indeed, quoting Justice Larson's dissent, Appellant stresses that "there is a great difference in the degrees of fault of the hospital

and [the patient]; the hospital was at fault to the extent it breached its duty to care for [the patient], while [the patient's] medical condition precludes him from being at fault at all." *Id.* at 29-30 (quoting *Vattimo*, 465 A.2d at 1244 (Larson, J., dissenting)).

Appellant submits that, even absent his conviction, DiNardo would still have a claim for medical malpractice, contending that his malpractice rights vested long before the murders, and that the complaint adequately pleaded damages for severe emotional distress, mental anguish, humiliation, and loss of life's pleasures unrelated to the civil suits brought against DiNardo by the murder victims. According to Appellant, mental health providers owe a common law duty to treat patients within the standard of care and to ensure proper medical care for the protection of third parties, citing *Seebold v. Prison Health Services*, 57 A.3d 1232 (Pa. 2011).

Finally, Appellant believes that, even if the no felony conviction recovery rule were applicable to DiNardo's claims, "public policy demands that [Appellees] be held accountable for their grossly negligent and reckless conduct." *Id.* at 35. Pointing out that Dr. Kohler took DiNardo off all of his psychotropic medications despite having specific knowledge that DiNardo was highly dangerous to himself and others when his medications were reduced, Appellant warns that allowing the no felony conviction recovery rule to bar DiNardo's claims in this case "would give physicians a free pass to knowingly and recklessly permit their patients to fall into violent psychosis with impunity, which jeopardizes lives, and the health, safety, and welfare of the citizens of this Commonwealth." *Id.* at 38. Appellant explains that the gross negligence and recklessness standard would provide guardrails for future litigation and would constitute an exception to the no felony conviction recovery rule. Thus, Appellant concludes that the no felony conviction recovery rule should not bar DiNardo's claims, or that there

should be an exception in these circumstances, not only because he is merely seeking compensation, but as a matter of public policy.

Appellees counter that the Superior Court correctly held that DiNardo could not recover either compensatory or indemnification damages with respect to the wrongful death lawsuits filed against him under the no felony conviction recovery rule.[5] While Appellant suggests that the no felony conviction recovery rule bars recovery only in cases where the plaintiff seeks to "profit" from their alleged crime and that DiNardo is merely seeking compensation, Appellees maintain that this distinction has no support in the case law, which precludes recovery of all losses flowing from an individual's criminal conduct. Even if not "profiting," Appellees submit that DiNardo would benefit significantly if allowed to pursue compensatory damages, in the form of protecting his assets through indemnification, as well as recovering damages for emotional distress and humiliation from committing the four murders. Appellees stress that this principle is rooted in longstanding public policy that a person should not be allowed to benefit from his own wrongdoing, especially his own crimes. Noting that our Court in *Albert v. Sheeley's Drug Store*, 265 A.3d 442 (Pa. 2021), recently applied the equitable doctrine of *in pari delicto* — which provides that a person may not recover damages if their cause of action is based, at least in part, on their own illegal conduct — Appellees proffer that that decision is instructive in the instant matter, as the same public policy consideration of ensuring that wrongdoers are not compensated for their illegal acts is present in both cases, and even more forcefully in this matter, due to the serious nature of DiNardo's crimes. Indeed,

---

[5] As a preliminary matter, Appellees claim that Appellant waived her challenge to the Superior Court's ruling on compensatory damages, alleging that she did not raise it in her petition for allowance of appeal. While perhaps Appellant's issues were less than clearly worded and did not explicitly mention compensatory damages, her petition specifically discussed compensatory damages in some detail and our order granting allocatur reframed the issue to encompass the compensatory damages issue. Thus, we find the claim to be preserved.

Appellees warn that allowing a recovery here would "not only condone heinous and reprehensible criminal acts, but encourage felons like [DiNardo] to plead guilty in a deal with the Commonwealth, only to later shift blame to third parties in order to seek substantial damages from 'deep-pocket' defendants for indemnification and the 'emotional distress' of being held legally accountable for their crimes." Appellees' Brief at 20. Appellees point to decisions from various jurisdictions which have rejected psychiatric malpractice actions brought against mental health providers by criminal wrongdoers.

Appellees claim that DiNardo's losses "indisputably flow from his criminal conduct." *Id.* at 23. In this regard, Appellees emphasize that DiNardo voluntarily pleaded guilty to the four first-degree murders which led to his alleged damages, and the complaint explicitly attributed his claimed losses to his criminal acts. Indeed, Appellees highlight that Appellant's complaint specifically links DiNardo's compensatory damages to the murders for which he was convicted, and describes DiNardo's emotional distress and physical pain as resulting from: "(1) living with the knowledge that he murdered four individuals while in an otherwise treatable psychotic state, (2) knowing his family's businesses suffered irreparable harm due to his actions while in a psychotic state, (3) knowing his family will bear the costs of litigation and judgment due to the murders committed while in a psychotic state, and (4) knowing he will spend the remainder of his life in state prison." *Id.* at 25 (quoting Amended Complaint at ¶ 202) (emphasis and internal quotations omitted). Moreover, Appellees point out that the complaint does not seek or identify any malpractice damages unrelated to the murders, further evincing that the alleged losses flowed solely from DiNardo's criminal acts, rather than the actions of Appellees in treating him.

Appellees also maintain that barring recovery in this case is consistent with the Slayer's Act, which seeks to determine whether an individual acquired any property or benefit from a killing and to prevent such person from profiting by his own wrongdoing. 20 Pa.C.S. § 8815. In this vein, Appellees highlight that the definition of benefit under the Slayer's Act has been broadly construed to include anything that works to the advantage or gain of the recipient, citing *Drumheller v. Marcello*, 532 A.2d 807, 810 (Pa. 1987). Appellees also note that courts in numerous other jurisdictions have rejected claims like Appellant's based on sound public policy, that a criminal wrongdoer must bear responsibility for his own criminal conduct and cannot shift blame for that conduct by alleging medical malpractice on the part of mental health providers who treated him.

Relatedly, Appellees contend that, regardless of whether the no felony conviction recovery rule applies, Appellant's indemnification claim was properly dismissed under *Vattimo*, because DiNardo was an "active participant" in the murders he committed, as confirmed by his guilty pleas. Appellees' Brief at 42. It is for this reason, Appellees submit, that Appellant's assertions that DiNardo was not the true party at fault, and that Dr. Kohler was the active participant, must be rejected. In this regard, Appellees urge that DiNardo's guilty pleas serve as an admission of liability and responsibility for the murders, and the doctrine of collateral estoppel precludes DiNardo's "unwarranted about-face and belated effort to shift blame to [Appellees]." *Id*. at 44-46. Furthermore. Appellees argue that Appellant cannot rely upon Justice Larson's dissent in *Vattimo* because the dissent was premised on not holding "mentally deficient" criminal defendants liable for civil damages flowing from their own conduct; yet, here, DiNardo did not claim that he was not guilty by reason of insanity, or that he was guilty but mentally ill.

Finally, Appellees reject Appellant's argument that claims of gross negligence survive under the no felony conviction recovery rule. Appellees explain that healthcare

providers may owe duties in limited circumstances to warn third parties of a threat but owe no duty to prevent a patient from committing a crime. *See Emerich v. Philadelphia Center for Human Development, Inc.,* 720 A.2d 1031, 1040 (Pa. 1998). Appellees continue that there is no "gross negligence" exception to the no felony conviction recovery rule, and suggest that Appellant is "essentially ask[ing] this Court to perform a comparative negligence analysis that weighs DiNardo's blameworthiness for his alleged losses against that of [Appellees]," but noting that our decision in *Albert* eschews the application of comparative negligence principles where a plaintiff seeks recovery for damages caused by his own criminal acts. *Id.* at 51.[6]

---

[6] In support of Appellees, *Amicus* Hospital and Healthsystem Association of Pennsylvania emphasizes that, as a matter of public policy, plaintiffs who are mentally capable of pleading guilty and standing trial should be barred from seeking civil recovery for injuries flowing from their criminal acts, and stresses that disregarding the no felony conviction recovery rule under the circumstances of this case "risks undermining the coherence and legitimacy of the legal system as a whole." Amicus Brief at 8. *Amicus* also warns that permitting convicted criminals to sue mental health providers would lead to increased healthcare costs due to the "open[ing of] the floodgates to a deluge of malpractice claims for losses flowing from criminal conduct," exposing "[e]very conceivable healthcare professional" to "claims grounded in a patient's volitional felonious conduct." *Id.* at 19. *Amicus* cautions that this would lead to lower access to behavioral health services, for which people in Pennsylvania already have limited access.

*Amici* American Psychiatric Association and Pennsylvania Psychiatric Society, taking a different view of Appellant's cause of action, emphasize that an action for indemnification is available only when the indemnitor owes a duty to the injured party. Thus, *Amici* contend that, to establish her claim, Appellant must demonstrate that Appellees were actually responsible for and could have prevented DiNardo's decision to murder four people. In other words, *Amici* suggest that Appellant's claim centers on whether Appellees owed a duty to the victims and their families by virtue of treatment provided to DiNardo, and contend that medical professionals owe a duty to warn third parties with respect to the conduct of a patient only when the patient communicates a "specific and immediate threat" against "a specifically identified or readily identifiable victim." *Emerich*, 720 A.2d at 1040. According to *Amici*, Appellees did not owe a duty to the victims because Appellant did not allege that DiNardo communicated such a threat or that the victims were readily identifiable, explaining that "it is an unreasonable extension of the concepts of duty and foreseeability to broaden a physician's duty to a patient and hold a (continued…)

With these arguments in hand, we turn to a review of the no felony conviction recovery rule in Pennsylvania and begin with a discussion of the origins of the doctrine. Generally speaking, and not unlike other health care providers, psychiatrists and psychologists are subject to liability for malpractice or professional negligence, including negligence related to recommending a particular course of treatment or inadequate treatment. *See*, *e.g.*, *McArdle v. Tronetti*, 627 A.2d 1219 (Pa. Super. 1993); *A. McD. v. Rosen,* 621 A.2d 128 (Pa. Super. 1993); *McKenna v. Mooney,* 565 A.2d 495 (Pa. Super. 1989); *see also Althaus ex rel. Althaus v. Cohen*, 756 A.2d 1166 (Pa. 2000) (declining to find cause of action by non-patient parents against child's psychiatrist). Claims of malpractice, however, are subject to certain statutory and common law defenses.

One venerable common law principle is that parties to an illegal or immoral action may not seek redress for damages suffered as a result of that action. Early in the law, serious criminals were deemed to be "outlaws," losing the protection of the laws for all purposes. *See generally* Joseph H. King, Jr., *Outlaws and Outlier Doctrines: the Serious Misconduct Bar in Tort Law*, 43 Wm & Mary L. Rev. 1011, 1014 (2022). The rationale behind this principle was that, having essentially renounced the law, an individual was in

---

physician liable to the public at large." Amici Brief at 6 (quoting *Estate of Witthoeft v. Kiskaddon*, 733 A.2d 623, 630 (Pa. 1999)).

Finally, *Amici* Pennsylvania Coalition for Civil Justice Reform, American Medical Association, Pennsylvania Medical Society, Philadelphia Medical Society, CURI, and American Property Casualty Insurance Association argue that the *ex turpi* principle, *see infra*, and the no felony conviction recovery rule apply with equal force regardless of whether the damages sought are considered "profit" or "compensation" for losses. Amici Brief at 13. In *Amici*'s view, refusing to apply the no felony conviction recovery rule and allowing DiNardo to recover civil damages under the circumstances of this case, where he pleaded guilty to the murders, would shock one's sense of justice, lead to public outcry, and would "make[] a mockery of the solemnity of his criminal proceedings, his conviction, his life sentence, and of any civil proceeding in which he might obtain an award." *Id.* at 15.

a state of nature, susceptible to slaying upon discovery. [7] *Id.* This absolutist approach softened over time, evolving for purposes of tort claims arising out of an individual's commission of a serious crime or misconduct into the principle that the violator was not entitled to redress for any injury to which his criminal conduct contributed. This "clean hands" or "serious misconduct" doctrine is considered to have emanated from the Latin maxim "*ex turpi causa non oritur acio*" ("from a wicked cause there arises no action") which had origins in contract law but was interpreted to apply to torts and precluded the bringing of a lawsuit by a person who committed an illegal or immoral act. Indeed, the "serious misconduct" or "wrongful conduct" doctrine has been referred to as the "outlaw" doctrine, or the "*ex turpi causa*" rule.

Although often referred to as a singular doctrine, there are in fact two related and sometimes overlapping principles through which the illegality defense is interpreted and applied. The first, the *ex turpi causa* rule noted above, focuses on the illegality of the underlying act, and holds that, if one is engaged in illegal activity, one cannot sue another for damages that arose out of that impermissible activity. The second, *in pari delicto est conditio defendtis* ("of equal guilt or fault"), focuses on the allocation of fault between the parties and provides that, in the case of mutual fault, the position of the defendant is the stronger one preventing recovery by a plaintiff. [8] While distinct, both stand on the premise

---

[7] A serious criminal would be considered "Wolveseved" or outlaw, and thus considered to be "caput lupinum," or bearing the head of the wolf, *id.* at 1014, and one who, as offered by Sir William Blackstone, "might be knocked on the head like a wolf, by any one that should meet him." King, *supra*, at 1014 (quoting 4 William Blackstone, Commentaries on the Laws of England 315 (Cambridge University Press 1979) (1769)).

[8] For brief history of the maxim, its Roman Law origins, and its early use in English Law, *see* J.K. Grodecki, *In Pari Delicto Potior Est Conditio Defendentis*, 71 L.Q. Rev., 254, 254-58 (1955). Grodecki identifies Lord Chief Justice Mansfield as first applying the doctrine in England in the case of *Smith v. Bromley*, 2 Doug. 696, 99 E.R. 441 (1760). However, *Holman v. Johnson*, *infra*, is regarded as the seminal case in which Lord Mansfield discussed both the *ex turpi causa* principle and the *in pari delicto* rule. *Holman*, 98 E.R. (continued…)

that one should not be permitted to recover damages that arise from his or her own illegal or immoral conduct. Lincoln Caylor, Martin S. Kenney, *In Pari Delicto and Ex Turpi Causa: The Defence of Illegality - Approaches Taken in England and Wales, Canada and the U.S.*, 18 Bus. L. Int'l 259, 260 (2017) (hereinafter "*The Defence of Illegality*").

The earliest reported discussion of the concept of a defense or bar to recovery based upon illegal conduct appears in the English decision of *Williams v. Everet*, 104 E.R. 725 (1725) (reproduced in 9 L.Q. Rev. 197 (1893)), also known as the *Highwayman's Case*. Therein, a business dispute arose regarding commodities, in particular, a gold watch. However, it became apparent to the court that, in actuality, the matter involved a dispute over a contract to share the spoils of an armed robbery between two highwaymen. This revelation resulted in the dismissal of the complaint, the lawyers being held in contempt, and the parties themselves arrested and hanged.

Later, in the seminal case of *Holman v. Johnson*, 1 Cowper 341, 98 E.R. 1120 (1775), Lord Chief Justice Mansfield more fully articulated the illegality defense as being grounded in the doctrine of *ex dolo malo non oritur actio*, opining that "[n]o Court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act." *Id.* at 1121. Thus, with these words, which were often cited as the origin of the *ex turpi causa* doctrine, Lord Mansfield heralded in centuries of courts grappling with the boundaries and impact of this principle. *The Defence of Illegality*, 18 Bus. L. Int'l at 260; *see generally* 5 Williston on Contracts § 12:4 (4th ed.).

The English rule quickly found its way to the United States, and Pennsylvania in particular, and became firmly established in our common law. *See, e.g., Mitchell v. Smith*, 1 Binney 110, 1804 WL 966 (Pa. 1804) (Shippen, C.J.) (offering that courts will not afford

---

at 1121. *See* Brian A. Blum, *Equity's Leaded Feet in A Contest of Scoundrels: The Assertion of the In Pari Delicto Defense Against a Lawbreaking Plaintiff and Innocent Successors*, 44 Hofstra L. Rev. 781, 837 (2016).

their aid to carry illegal contracts into execution); *id.* at 121 (Yeates, J.) (pointing to Lord Mansfield's public policy grounds for the principle that "[n]o court will lend its aid to a man who founds his cause of action upon an immoral or illegal act, if from the plaintiff's own stating or otherwise. If the cause of action appears to arise *ex turpi causa* or the transgression of a positive law of this country, there the court says he has no right to be assisted. It is upon this ground the court goes, not for the sake of the defendant, but because they will not lend their aid to such a plaintiff."); *In re Greifer's Estate*, 5 A.2d 118 (Pa. 1939) (holding a person convicted of murder cannot take as beneficiary under an insurance contract on the life of the victim); *Ad-Lee Co. v. Meyer*, 144 A. 540, 542 (Pa. 1928) (explaining that the principle set forth by Lord Mansfield in *Holman* "has always been the law of Pennsylvania . . . [and is] an unbending rule with us that neither law nor equity will aid one in relation to that which is wholly or partially immoral or illegal").[9]

While, as noted above, Pennsylvania's version of the wrongful conduct rule has a long lineage, our modern version of this rule, known as the "no felony conviction recovery rule," suffers from a paucity of caselaw. Our Court's most recent comments on the contours of the rule date back to the early 1960s and arose in the transactional context. *See Hurtt v. Stirone*, 206 A.2d 624, 626-27 (Pa. 1965) (finding one attempting to benefit from the commission of a felony — extortion — should be barred from recovery, but distinguishing convictions of minor matters such as traffic tickets and "major criminal convictions"); *Pennsylvania Turnpike Commission v. United States Fidelity and Guaranty Company*, 194 A.2d 423, 427 (Pa. 1963) (determining that Turnpike Commissioner's conviction for conspiracy to defraud the Commission and for misbehavior in office relating

---

[9] The United States Supreme Court has also adopted the broad principle of the unclean hands doctrine. *See Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 244-45 (1933).

to the consummation and performance of a contract served as evidence of a violation or breach of the conditions of the performance bond, and, thus, precluded recovery).

However, our Superior Court has rendered several decisions in this area. In *Mineo supra*, 125 A.2d 612 (Pa. Super. 1956), shortly before a fire was set by the owners of a restaurant, the owners had purchased four insurance policies on the property. After their arrest, they assigned their rights under the policies to a third party. The third-party assignee initiated an action against the insurance companies to recover damages caused by the owners' arson. The Superior Court first determined that "[t]he assignee in an assignment of a fire insurance policy made subsequent to a fire stands in the identical position of the insured and his rights cannot rise above the rights of the insured." *Mineo*, 125 A.2d at 614. The court held that the individuals who were named insureds in the fire insurance policy and who were convicted of arson for setting a fire to their restaurant were barred from recovery, reasoning that "[t]he common law principle that a person will not be permitted to benefit by his own wrong, particularly by his own crime, prevents the insured from recovering on insurance policies for loss caused by his crime." *Id.* at 615.

Thirty years later, in *Lewis v. Miller*, 543 A.2d 590, 593 (Pa. Super. 1988), a case involving two drivers who were drag racing resulting in the death of one of the drivers, the court extended the doctrine beyond the contractual context, and determined that the violation of the law demonstrating a conscious indifference to one's own safety and to public safety generally barred an individual from recovering for his injuries. In that matter, the estate of the deceased alleged that the direct and proximate cause of the accident between the decedent's vehicle and the other driver's was the negligent operation of the automobile driven by the other driver. The estate sought damages for lost wages and earnings of the decedent, and for pain, suffering and inconvenience sustained by him, as well as for damage to the automobile. *Id.* at 591. The court explained that the wanton

misconduct engaged in by the decedent — *i.e.*, participating in a drag race on a dangerous blind curve while intoxicated — barred recovery. In his concurrence, Judge Zoran Popovich went further, expressing his incredulity towards both the plaintiff and his attorney for bringing such a cause of action and scolding the decedent's estate for "the unmitigated temerity to demand financial redress for injuries received as a direct consequence of [decedent's] wanton commission of those crimes. Shall we now award monetary verdicts in civil court to a robber for injuries he received in a thwarted attempt to rob a convenience store? And one wonders about the ethical standards of an attorney who would accept and prosecute such a case. In the name of justice, we corrupt it." *Id.* at 593.

The Superior Court provided an articulation of the rule some 20 years later, in *Holt v. Navarro*, 932 A.2d 915 (Pa. Super. 2007). In that case, William Holt was initially committed to a psychiatric hospital for a mental health evaluation after experiencing schizophrenic episodes. While enroute by ambulance during a transfer to a different psychiatric facility, he escaped. Holt carjacked a vehicle occupied by an off-duty police officer, striking and threatening to kill the officer in the process. Only when uniformed police officers arrived at the scene did Holt cease his struggle. *Id.* at 920, 923. Holt was convicted of robbery and simple assault. He brought a civil action against the ambulance service for negligently transporting him and failing to restrain him, thereby enabling him to flee the vehicle. Holt alleged that, but for the service's negligence, he would not have committed the criminal acts and lost earning capacity as a result. *Id.* at 920. The jury returned a verdict for Holt, and the trial court denied the defendant's motion for post-trial relief seeking judgment notwithstanding the verdict.

On appeal, Judge Susan Gantman writing for the Superior Court applied the no felony conviction recovery rule, explaining that the rule is a "common law principle that a

person should not be permitted to benefit by his own wrongdoing, particularly his own crimes, [and that it] prevents a plaintiff from recovering losses which flowed from those criminal acts." *Id.* Under the rule, the court determined that Holt was precluded from recovering in a civil suit damages flowing from his criminal convictions for robbery, a second-degree felony, and simple assault, a second-degree misdemeanor; which the court viewed as serious criminal offenses. Thus, the court held that, as a matter of law, the ambulance service could not be liable for the collateral consequences of Holt's criminal convictions. *Id.* at 923.[10]

Finally, while not directly on point, we would be remiss if we did not discuss our Court's recent exposition of the law involving the *in pari delicto* doctrine,[11] which informs

---

[10] Although the parties have discussed our Court's plurality decision in *Vattimo*, we find it unhelpful. In *Vattimo*, James Vattimo was admitted to the Lower Bucks Hospital's psychiatric ward after exhibiting bizarre behavior, including an abnormal fascination with fire, and ultimately was diagnosed with paranoid schizophrenia. Vattimo started a fire in his hospital room that killed the other patient in the room. Vattimo was charged with first-degree murder and arson, but was found not guilty by reason of insanity. His parents, on their own behalf and on behalf of their son, brought a civil action against the hospital for negligence. The parents requested damages similar to those sought in the instant case: legal expenses incurred in the defense of Vattimo's criminal prosecution and related civil action, indemnity for any judgment against Vattimo in the civil action, and damages for Vattimo's physical and emotional injuries.

Ultimately, our Court, in an opinion announcing the judgment of the court authored by former-Chief Justice John Flaherty, and relying on principles of proximate cause, explained that Vattimo's parents could proceed with their claims to recover costs associated with Vattimo's medical and psychiatric care, as well as damages asserted on his behalf for mental anguish, loss of employment, and public humiliation. *Id.* at 1237-38. However, the Court precluded the claims for indemnity and legal defense costs. In addition to the fact that our decision in *Vattimo* is non-precedential, as it was a plurality decision, Vattimo was not convicted of the charged crimes, but found not guilty by reason of insanity; thus, the Court had no occasion to consider the no felony conviction recovery rule.

[11] *In pari delicto potior est conditio defendentis* means "in a case of equal or mutual guilt . . . the position of the [defending] party . . . is the better one." James W. Sprague, *The Fault in in Pari Delicto: How Illegality Bars and Moral Culpability Collide with Tort Law*, 10 Wake Forest L. Rev. Online 107, 110 (2020) (hereinafter "*The Fault in in Pari Delicto*").

our understanding of the no felony conviction recovery rule, as the *in pari delicto* doctrine is its corollary. These two concepts have similar origins, are grounded in the same public policies, and are sometimes used interchangeably. The *in pari delicto* doctrine originated and is used more commonly, in contractual or transactional disputes, yet has migrated to other contexts, including tort law. Whereas the focus of the no felony conviction recovery rule is on one party's misconduct, the *in pari delicto* doctrine is more concerned with the transaction as a whole; in other words, with respect to the *in pari delicto* doctrine, the real objection is not to one person's criminal activities, but to the unlawful enterprise. *See generally The Fault in in Pari Delicto*, 10 Wake Forest L. Rev. Online at 110-12.

As explained in depth by Justice Wecht in our recent decision in *Albert*, *supra*, as do many states, Pennsylvania follows the "classic formulation" of the *in pari delicto* doctrine. *Albert*, 265 A.3d at 448-49; *see also Official Committee of Unsecured Creditors*, 989 A.2d 313, 329 (Pa. 2010) (quoting *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306-07, (1985)). The *in pari delicto* doctrine precludes plaintiffs from recovering damages if their cause of action is based at least partially on their own illegal conduct. It applies when a plaintiff has been an active, voluntary participant in the wrongful conduct or transaction for which the plaintiff seeks redress, and bears "substantially equal [or greater] responsibility for the underlying illegality" as compared to the defendant. *Albert*, 265 A.3d at 448-49 (citation omitted). The rule exists to serve the public interest by relieving courts from lending their offices to mediating disputes among wrongdoers, and thereby condoning criminal conduct and possibly encouraging criminal activity, so as to preserve the public's perception of the legal system. *Id.* at 451.

In short, our case law, while somewhat limited, firmly establishes that, under both the no felony conviction recovery rule and the *in pari delicto* doctrine, persons convicted of serious crimes must bear the losses stemming from their criminal acts, and, as a matter

of public policy, will not be permitted to shift responsibility for these losses to others. Stated another way, injuries that flow from volitional criminal conduct cannot provide a basis for a recovery in tort.

Similar to our Commonwealth's decisional experience with the rule, other state courts routinely bar plaintiffs from seeking damages for injuries sustained as a result of their own criminal conduct. *See, e.g.*, *Greenwald v. Van Handel*, 88 A.3d 467, 477-78 (Conn. 2014); *Cork v. St. Charles County*, 10 S.W.3d 608, 609 (Mo. Ct. App. 2000); *Oden v. Pepsi Cola Bottling Co. of Decatur, Inc.*, 621 So.2d 953, 955 (Ala. 1993); *Lord v. Fogcutter Bar*, 813 P.2d 660, 662 (Alaska 1991); *Barker v. Kallash*, 468 N.E.2d 39, 41 (N.Y. 1984).

More specifically, in the context of this case, courts are virtually unanimous in rejecting a patient's attempt to shift responsibility for the cause and consequences of their criminal actions onto their psychiatrist or healthcare provider. *See, e.g.*, *Masrur v. Regents of the University of Michigan*, 2022 WL 16858805 (Mich. App. filed Nov. 10, 2022) (rejecting argument that an "insanity exception" applied under Michigan's wrongful conduct rule where plaintiff entered a plea of guilty but mentally ill); *Muscat by Berman v. Creative Innervisions LLC*, 418 P.3d 967, 972 (Ariz. App. 2017) (where escaped child molester sued institution he had escaped from, allowing recovery for "the legal consequences of a ward's criminal conduct as a legally cognizable injury would distort the long-established public policy of personal accountability for criminal behavior"); *Guillie v. Comprehensive Addiction Programs, Inc.*, 735 So.2d 775, 779 (La. Ct. App. 1999) (concluding that patient could not bring cause of action against psychiatric facility where his criminal conduct — stealing money from his employer — led to his loss of employment); *Rimert v. Mortell*, 680 N.E.2d 867, 876 (Ind. Ct. App. 1997) (explaining that patient convicted of murder could not recover from psychiatrist damages that stemmed

from his criminal conduct); *Burcina v. City of Ketchikan*, 902 P.2d 817, 819 (Alaska 1995) (determining that a patient convicted of arson could not sue his psychiatrist for damages for mental anguish, loss of income, loss of enjoyment of life, and emotional distress flowing from imprisonment); *Glazier v. Lee*, 429 N.W.2d 857, 859-60 (Mich. Ct. App. 1988) (denying patient convicted of manslaughter of recovery for emotional and psychological damages as "it would be, plainly and simply wrong as a matter of public policy to allow recovery"); *Cole v. Taylor*, 301 N.W.2d 766, 768 (Iowa 1981) (barring patient from suing her psychiatrist for negligently failing to prevent her from committing murder as against public policy).

Finally, we elaborate upon the public policy which undergirds the no felony conviction recovery rule. Initially, we stress that the rule is founded upon the public interest, and arises from the premise that injuries arising from volitional criminal conduct should not provide a basis for a recovery in tort. Concepts such as proximate cause, duty of care, and, here, access to the legal system, are "necessarily rooted in public policy considerations, *i.e.*, our ideas of history, morals, justice and society in general in determining where the loss should fall." *Gardner v. Consolidated Rail Corp.,* 573 A.2d 1016, 1020 (Pa. 1990). Generally speaking, the rule contemplates notions of fairness, personal responsibility, and the protection of our legal institutions and public confidence therein. As eloquently set forth by Judge Robert Woodside in the Superior Court's opinion in *Mineo*:

> To permit a recovery under a policy of fire insurance by one who has been convicted of burning the property insured, would be to disregard the contract, be illogical, would discredit the administration of justice, defy public policy and shock the most unenlightened conscience. To sustain such a judgment would be to encourage and give support to the current thoughtless and carping criticisms of legal procedure . . . .

*Mineo*, 125 A.2d at 617 (citing *Eagle, Star & British Dominions Co., Inc. v. Heller*, 140 S.E. 314, 323 (Va. 1927)). The court also warned of the negative impact on the public's perception of the judiciary:

> It would tend to destroy the confidence of the public in the efficiency of the courts; it would stir up litigation that would reopen tried issues; it would impress the public with the belief that the results of trials of the gravest nature were so uncertain that the innocent could not escape condemnation; and it would convince the public that the courts themselves have no confidence in the judicial processes.

*Id.* at 618.[12] Even more compelling, allowing such civil actions would impact the criminal justice system and the public's perception thereof, as it would undercut the goal of affording finality and respect to the criminal justice system's allocation of responsibility and allow tort awards that in context would shock one's sense of ordinary justice.

Not only would the judiciary and the criminal justice system be negatively impacted by allowing one to recover civil damages for injuries arising from serious criminal conduct, but, in the context of this case, there could be detrimental effects on the practice of psychiatric medicine. Allowing the recovery of damages from a mental healthcare provider for a patient's criminal conduct could undermine trust between the patient and psychiatrist; encourage psychiatrists to refuse to treat, or avoid treating, certain patients; spur institutionalization and excessive medication out of concern for financial liability should patients be released from care and commit crimes; and would not respect the

---

[12] Consistent therewith, it has been urged that, to allow such recoveries risks undermining the legitimacy of the legal system as a whole, essentially "giv[ing] with one hand (tort law) what had been taken with the other (criminal law)." *Amicus* Hospital and Healthsystem Association of Pennsylvania Brief at 8. Related thereto, such permissiveness could induce a new cottage industry of litigation for convicted criminals seeking to recover losses stemming from their crimes.

difficulty mental healthcare professionals face in predicting whether an individual poses a risk of violence.

Finally, such civil actions would have a financial impact on society by potentially increasing healthcare costs if medical care providers became "guarantors" of the financial costs of the crimes committed by their patients.[13]

For all of these reasons, we reaffirm that the no felony conviction recovery rule bars an individual from maintaining a tort action for damages that are sustained as the direct result of his volitional participation in, and conviction for, serious criminal acts, and prohibits that person from recovering for losses which flowed from such acts.

However, in so doing, we clarify certain aspects of the no felony conviction recovery rule. First, and critically, the illegal act must have a causal connection to the damages sought — that is to say, a plaintiff's commission of a crime does not insulate a defendant from liability if the crime is not proximately related to the recovery sought. Furthermore, the rule applies where one acts volitionally. As a guilty plea to first-degree murder is at issue in this matter, we need not address the applicability of the rule where an individual's actions are deemed to be less than intentional, such as in the context of a judicial finding of insanity or a verdict of guilty but mentally ill, where the calculus regarding the rule's application may differ.[14] Related thereto, as the matter *sub judice* involves a

---

[13] The public policy underlying the *in pari delicto* doctrine is similar to that of the no felony conviction recovery rule, in that allowing such causes of action would: "(1) condone and encourage illegal conduct; (2) allow wrongdoers to receive compensation for, and potentially even profit from, their illegal acts; and (3) lead the public to 'view the legal system as a mockery of justice.'" *Albert*, 265 A.3d at 448 (quoting *Orzel v. Scott Drug Co.*, 537 N.W.2d 208, 213 (Mich. 1995)).

[14] The requirement of volitional conduct distinguishes the no felony conviction recovery rule from the operation of comparative negligence principles. Comparative negligence principles apply whenever a plaintiff is contributorily negligent, while the no felony conviction recovery rule applies whenever a plaintiff intentionally commits serious criminal acts that directly cause the harm for which he or she seeks to benefit. In other words, the (continued…)

conviction, we need not consider whether criminal acts which do not result in a conviction may be covered by the rule. Finally, pleading guilty to first-degree murder unquestionably involves the conviction for a serious criminal act; thus, we need not address the application of the rule to less serious crimes.

In addition, the no felony conviction recovery rule applies with equal force regardless of whether the damages sought are considered "profit" or "compensation" or a "benefit." In all cases, a criminal is barred from recovering damages that flowed from his criminal conduct. As we offered in *Holt*, "a person should not be permitted to *benefit* by his own wrongdoing, particularly his own crimes, [and the rule] prevents a plaintiff from recovering losses which flowed from those criminal acts." *Holt*, 932 A.2d at 920 (emphasis added). The public policies underlying the rule do not draw a fine line between profit, compensation, and benefit, as they broadly focus on fairness, personal responsibility, and the integrity of our institutions.[15] Thus, we reject Appellant's attempt to differentiate between separate types of recovery, thereby cabining the rule's application.[16]

_____

no felony conviction recovery rule stands outside of comparative negligence principles. Thus, we reject any suggestion by Appellant that the no felony conviction recovery rule is inconsistent with comparative negligence concepts. *Cf*. *Albert,* 265 A.3d at 451 ("[N]othing in Pennsylvania's comparative negligence statute suggests that the General Assembly intended to abolish the common law *in pari delicto* defense . . . . And courts generally should not assume that the legislature intended to preempt the common law unless the statute explicitly says so.").

[15] For this reason, we also reject Appellant's reliance upon *Laskowski*, as not only is that federal district court decision not binding on our Court, it offered an interpretation of the no felony conviction recovery rule without rigorous analysis of the finite question before us, and, ultimately, its conclusion is inconsistent with the public policy of our Commonwealth which more broadly prohibits an individual from gaining from his criminal wrongdoing.

[16] This understanding of the rule is entirely consistent with the Slayer's Act, which our Court has interpreted broadly, construing the statutory prohibition to "profit" from wrongdoing to bar recovery of any "benefit" of any kind. *Drumheller*, 532 A.2d at 811.

We now turn to the rule's application to this case. First, it is conceded that DiNardo pleaded guilty to four counts of first-degree murder — unquestionably serious and heinous crimes. DiNardo did not plead insanity or guilty but mentally ill. As a result of his guilty plea to four counts of first-degree murder, he accepted full responsibility for the willful and premediated murders of four victims. It is for this reason that we reject Appellant's assertion that *Dr. Kohler* was the "active participant" in the murders and that DiNardo "is not the true party at fault." Appellant's Brief at 28. In essence, Appellant seeks to relitigate DiNardo's criminal conviction. We cannot afford her the opportunity to do so; Appellant's guilty plea, in which he took sole responsibility for his criminal conduct, vitiates any attempt to shift responsibility for the murders to Dr. Kohler or Appellees.

Second, the causes of actions raised by Appellant against Appellees, and the losses for which DiNardo seeks recovery, all flow from the murders to which DiNardo pleaded guilty. Any damages recovered would plainly benefit DiNardo for his own wrongdoing. Specifically, recovering damages for emotional distress and mental anguish due to committing the murders, receiving indemnification for the judgments awarded to the victims' estates, and receiving costs and counsel fees for defending the claims brought by the victims' estates against him, all would constitute a significant benefit to DiNardo.

A review of Appellant's complaint bears out these conclusions. As this matter arose in the context of preliminary objections in the nature of a demurrer, we must review her complaint as a whole and in the light most favorable to her to see if any recovery is possible under the law. Our careful review of Appellant's complaint, when viewed in this

fashion, confirms that all causes of actions pled, and damages sought, related to DiNardo's murder convictions.[17]

Specifically, the first four counts of the complaint, under the caption "Theories of Liability," identically allege gross negligence against each Appellee; however, all focus upon DiNardo's criminal acts, and the civil actions brought against him by the estates of DiNardo's victims. *See, e.g.*, Amended Complaint at ¶¶ 140-46; 156-62; 171-77; 187-93. For example, with respect to Appellant's theory of liability for gross negligence against Appellee Dr. Kohler, she asserts:

> 140. As a direct and proximate result of Dr. Kohler's gross negligence, [DiNardo] sustained damages including mental and emotion [sic] harm and costs of litigation.
>
> *       *       *
>
> 142. [DiNardo] cannot be considered an active tortfeasor because of the severe psychosis he suffered as a direct result of Dr. Kohler's grossly negligent management of his condition. . . . Thus, Dr. Kohler is wholly responsible for the damages at issue in this lawsuit.
>
> 143. Dr. Kohler's gross negligence increased the risk that [DiNardo] would suffer severe and last [sic] damages, including the future judgments that will be levied against him, attorney's fees, other costs expended or incurred in defending the suits against the four victims, severe emotional distress, mental anguish, humiliation, and loss of life's pleasures.

---

[17] In her brief and at oral argument, Appellant claims that DiNardo's malpractice damages are not limited to the litigation brought by his murder victims. According to Appellant, DiNardo's claims vested and were ripe before the murders. We acknowledge that claims of negligence for injuries that do not flow from criminal conduct could potentially serve as the basis for a viable malpractice action, such as a misdiagnosis or mistreatment that resulted in suicide or emotional distress. Here, however, the complaint, when read as a whole and in the light most favorable to Appellant, does not seek, assert, or identify any malpractice damages unrelated to the murders, or raise claims that are untethered to DiNardo's criminal conduct.

144. As a direct and proximate result of Dr. Kohler's gross negligence, Dr. Kohler's negligence forced [DiNardo] to defend himself against suits of the four individuals he killed while in a psychotic state.

145. As a direct and proximate result of Dr. Kohler's gross negligence, [DiNardo] has suffered damages because of future judgments, attorney's fees, and other costs expended or incurred in defending the suits against the four victims.

146. [DiNardo] would not have to expend or incur any costs of litigation or judgment if Dr. Kohler did not deviate from the standard of care.

Amended Complaint at ¶¶ 140-46.

Additionally, the complaint sets forth two causes of action. The first cause of action is for "Gross Negligence - Emotional and Physical Pain" against all Appellees. Amended Complaint at 34. The count for gross negligence alleges that as a "direct and proximate result of [all Appellees'] gross negligence," DiNardo sustained the following damages:

a. Severe emotional distress and physical pain from living with the knowledge that he murdered four individuals while in an otherwise treatable psychopathologic state;

b. Severe emotional distress and physical pain knowing his family's businesses suffered irreparable harm due to his actions while in a psychotic state;

c. Severe emotional distress and physical pain knowing his family will bear the costs of litigation and judgment due to the murders committed while in a psychotic state;

d. Severe emotional distress and physical pain knowing he will spend the remainder of his life in state prison.

Amended Complaint at ¶ 202.

An additional cause of action asserting a claim for "Indemnification" against all Appellees sought recovery for attorney fees and litigation costs associated with defense

of the civil actions and the judgments levied against him. Amended Complaint at ¶¶ 214-15. Finally, the complaint alleged a cause of action against Appellee Trustees of the University of Pennsylvania, alleging that the Trustees were liable for "the damages described in this complaint," Amended Complaint at ¶ 216-26 — that is, compensatory damages and indemnification.

As can plainly be seen, reading the complaint as a whole and in the light most favorable to Appellant, the theories of liability, causes of action, and damages alleged all flow from DiNardo's own volitional homicidal conduct, to which he pleaded guilty. This being the case, under the no felony conviction recovery rule, the causes of action asserted and claims for damages are not sustainable. Thus, Appellant's complaint fails as a matter of law.

For the reasons set forth above, the order of the Superior Court is affirmed.

Jurisdiction relinquished.

Justices Donohue, Dougherty, Wecht, Mundy and Brobson join the opinion.

Justice Dougherty files a concurring opinion.